Julia K. Robertson v. Commissioner. Clifton B. Robertson v. Commissioner.
Julia K. Robertson v. Commissioner
Docket Nos. 16782, 16783.
United States Tax Court
1949 Tax Ct. Memo LEXIS 67; 8 T.C.M. (CCH) 870; T.C.M. (RIA) 49234; September 29, 1949
A. Calder Mackay, Esq., Adam Y. Bennion, Esq., Pacific Mutual Bldg., W. 6th St., Los Angeles, Calif., and John C. Mackay, Esq., for the petitioners. E. C. Crouter, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: In these consolidated proceedings the Commissioner determined deficiencies in individual income tax for the calendar years 1944 and 1945 as follows: Docket
No.
Petitioner
Year
Deficiency
16782
Julia K. Robertson
1944
$5,759.22
1945
9,310.99
16783
Clifton B. Robertson
1944
5,759.22
1945
9,310.99
The sole issue is whether the Commissioner erred in determining that gains *68 realized by petitioners from the sale of certain real properties in 1944 and 1945, and from an exchange of real properties during 1945 constituted ordinary income instead of longterm capital gains, as claimed by petitioners. Findings of Fact Petitioners Clifton B. and Julia K. Robertson are husband and wife, residing in Los Angeles, California, and filed separate income tax returns for each of the calendar years 1944 and 1945 on the community property basis with the collector of internal revenue for the sixth district of California. Clifton B. Robertson, having managed all of the business from which income was received, is hereafter referred to as "petitioner." In 1944 and 1945 and for some years prior thereto, petitioner's business was that of contractor and builder of residential construction. His career as such began in 1934 with the sale of a house in Westwood, California, which he was building for his own residence, but sold before it was ready for occupancy. From then on and up to and including 1942, he built about six houses a year to be sold to buyers upon completion, the price ranging from $20,000 to $25,000 each. Most of these were in Westwood and Beverly Hills and *69 none of them was rented or offered for rent. He discontinued building homes for sale in this area in 1942, and sold the last of these houses in 1943. Late in 1942, also in 1943 and 1944 petitioner acquired a large number of unimproved lots in the Lakewood area of Los Angeles County for the purpose of constructing for rental a large number of multiple housing units (sometimes hereafter called Lakewood properties). In securing authorization for such construction from the War Production Board of a "privately owned war housing project" petitioner, in formal applications upon government prescribed forms, obligated himself, among other things, (1) "to hold same for rent" and at rentals authorized by the National Housing Agency; (2) to rent only to eligible war workers; (3) not to "dispose of nor enter into any agreement or contract for the disposal of any" of the property except as authorized by the National Housing Agency under General Order 60-3 of the National Housing Agency, which General Order, among other things provides that a dwelling unit in a private war housing project may be purchased by an occupant after four months continuous occupancy, if the sale price is not in excess *70 of the fair market price or $6,000, whichever is lower, and the purchaser must be an eligible war worker. Petitioner, in Lakewood properties, built during 1943 and 1944 the following: 3 three-unit dwellings, 73 four-unit dwellings, 31 two-unit dwellings and 53 six-room single-family dwellings or a total of 416 rental units at a total construction cost of in excess of $1,000,000. Upon completion of these properties all of them were rented by petitioner to war workers for an average rental of $45 to $47.50 per month. He maintained a rental office to manage these properties, but had no sales office. The construction of these projects was financed by loans from the Bank of America through the Federal Housing Administration in the form of a first trust deed on each individual property. Petitioner's account with the Bank of America under the heading "Borrower's Liability" shows the amounts owing on these first trust deeds as follows: On December 30, 1943, $736,645.11, on January 5, 1944, $791,546.11, and on May 12, 1945, $1,719,189.21. 1944 Sales by Petitioners: In April 1944 they sold 2 four-unit apartments and also sold in December 2 four-unit apartments, all being Lakewood properties, *71 and all having been held by them for more than six months prior to sale. In their income tax returns they reported the total net gain from these sales of $13,931.90 as long term capital gains. 1945 Sales by Petitioners: In January 1945 they exchanged 5 four-unit dwellings for a ranch which they acquired and continue to hold as an investment. The party to whom the apartments were traded assumed the deed of trust on each building. In June 1945 petitioners sold 1 four-unit apartment, and also from September to December 1945 they sold 9 single houses as follows: 2 in September, 1 on October 11, 3 in November and 1 in December, all, including those traded for the ranch, being part of Lakewood properties, and held for more than six months. In their 1945 income tax returns they reported a net gain on exchange of "like properties" of $26,950.90, and a net gain on sale of real estate of $10,114.33, all of which they treated as long term capital gains. At the end of 1945 petitioners owned and held about 367 rental units all then rented. The properties which petitioner sold and exchanged in 1944 and 1945 had all been rented to war workers and were never advertised nor listed for sale, and *72 petitioner made no effort to sell them; he instructed his rental office to advise all inquirers that he was not interested in selling the properties, and with one exception it was upon insistence from the buyers and reluctance upon his part that such sales were made. Petitioners reported net profits from rents for 1944 of $18,037.26, which Commissioner, by decreasing depreciation claimed, increased to $37,285.62. For 1945 they reported net profit from rents of $4,647.44, which the Commissioner likewise increased to $27,796.41. Petitioners have acquiesced in these increases. The Commissioner determined that all of the properties sold and exchanged in 1944 and 1945 were held by petitioners "primarily for sale to customers in the ordinary course of a trade or business", and that the gains therefrom are taxable as ordinary gains, and recomputed the tax due by petitioners on that basis. Effective October 15, 1945, by order of the War Production Board and the National Housing Agency (10 Federal Register 12762), there was terminated all control and restrictions as to the occupancy and disposition of war housing such as Lakewood properties. This revocation removed all sales *73 prices and other priority restrictions and conditions on all such properties. In the latter part of 1945 petitioners acquired a large number of lots and began the construction of 100 single family dwellings for sale only and not for rent. They were completed in 1946 and petitioners sold 64 in that year through real estate brokers, after "for sale" advertisement, most of them being sold upon completion. None of these houses were ever rented. Petitioners also sold in 1946 a number of units of Lakewood properties which, under National Housing regulations, had been rented to war workers. The total number of 1946 sales by petitioners was 205, the profits from all of which were reported by them in their 1946 income tax returns as ordinary income. Opinion We think the respondent erred in his determination that the properties sold and exchanged by petitioners in 1944 and 1945 were held by them "primarily for sale to customers in the ordinary course of a trade or business." The evidence shows the contrary to be true. All of the properties here involved were units of a private War Housing project, built by petitioner (or petitioners) under authority of the War Production Board and the *74 National Housing Agency for the express purpose of rental to war workers, and all were so rented prior to and at the time of their sale and exchange. In order to secure authorization for their construction, priority for materials and financing by the National Housing Agency, petitioner, as required by law, made formal application in which inter alia he obligated himself as to such units to "hold them for rent", at rentals authorized by the Government, and only to eligible war workers. The purpose of these war time requirements by the Government, aside from conserving material for the war effort, was obviously to secure adequate rental housing for defense workers at reasonable rentals and so that the workers would not have to buy a house to stay on the job. Accordingly, sale or disposition of such housing units, or even a contract for their disposition or sale, was discouraged and restricted. Sales could only be made under authorization of the National Housing Agency to occupants after four months continuous occupancy and at prices prescribed, etc. Unless without evidence we are to impeach the good faith of petitioner's contract with these government agencies, the housing units *75 in question were acquired by petitioner for rental purposes and not primarily for sale to customers in the ordinary course of a trade or business. Furthermore, petitioner's testimony that such was his purpose in acquiring the properties is corroborated by the use to which the properties were devoted in the taxable years. In those years they were devoted primarily to rental, not to sales. The sales were few and exceptional, and it is not claimed that they were made in violation of petitioner's contract with the Government. It cannot be said that in those years there was a "frequency" and "continuity" of sales, sometimes one of the determinative factors in cases of this kind. In 1944 he sold only four units, and in 1945, five were traded and ten were sold. Of the total units owned by petitioners in these years, these sales constituted about one per cent and four per cent respectively. Petitioner did not advertise or list any of the properties for sale, and made no effort to sell them. All circumstances concerning the acquisition and use of these properties in the taxable years stamp them as rental or investment property and not property held primarily for sale. Respondent's adverse *76 conclusion is based largely upon assumptions and deductions. He contends: (a) Since it appears that petitioner derived a larger percentage of profits from sales than from rentals "it is not reasonable to assume" that he would borrow over a million dollars to receive a small rental income rather than a "reaping of profits" from sales; (b) that petitioner, prior to 1943, having been profitably engaged in building houses for sale, except for the fact that he "had no other alternative" would not have changed his business to that of rental; and (c) petitioner's 1946 resumption of building for sale indicates that in the taxable years he was holding the property for sale, and cites Neils Schultz, 44 B.T.A. 146, where the taxpayer after renting the property for some years before selling it, was nevertheless found to have held the property primarily for sale. There, however, the sale involved property sold in the taxable years, and not subsequently. There, also the Court found specifically that the taxpayer "acquired the land to be held for sale to customers" and the evidence here justifies no such finding. It matters not whether petitioner, from necessity or from choice, changed *77 his business in the taxable years from building houses for sale to building them for rent. The question is, did he make such change, and the evidence shows that he did. Many individuals in the war years changed the kind of business in which they were engaged. In some instances the ratio of profits was larger, and in others smaller, but as patriotic citizens they cooperated, regardless of results. A vast majority of them also, when the war ended, resumed the same business in which they had been theretofore engaged, as did the petitioner. The parties are agreed that the determination of whether the exchange of the improved real estate for the ranch property qualified the exchange of like properties within the meaning of section 112(b)(1) of the Code depends upon the decision of the primary question as to whether the particular properties exchanged were held by petitioner primarily for sale to customers in the ordinary course of business. We hold that the properties sold and also those exchanged within the taxable years were not held by petitioners primarily for sale to customers in the ordinary course of a trade or business, and that the profits therefrom are taxable as long term *78 capital gains. Decisions will be entered for the petitioners.